Jane **PERLMAN** et al., Plaintiffs,
and
**Harry Mernoff, Plaintiff-Intervenor,**
v.
**C. Russell FELDMANN** et al., and New-
port Steel Corporation, Defendants.
**Civ. A. No. 3086.**

United States District Court,
D. Connecticut.

Dec. 8, 1952.

See also, 116 F.Supp. 102.

Pomerantz, Levy, Schreiber, & Haudek, New York City, (Abraham L. Pomerantz, William F. Haudek, New York City, of counsel; J. Alvin Van Bergh, Philip W. Haberman, Jr., and Sidney L. Garwin, New York City, with them on the briefs), general counsel for all plaintiffs.

Pomerantz, Levy, Schreiber & Haudek, New York City, Saltman Weiss & Connors, Bridgeport, Conn., Sidney L. Garwin, Abraham S. Ullman, New Haven, Conn., Proskauer Rose Goetz & Mendelsohn, New York City, Marsh Day & Calhoun, Bridgeport, Conn., Nemerov & Shapiro, William Rosenfeld, New York City, attorneys for plaintiffs.

Arthur H. Dean and Howard T. Milman, of Sullivan & Cromwell, New York City (Edward M. Harris, Jr., and Karl G. Harr, Jr., New York City, of counsel), and Raymond E. Hackett and William H. Timbers, of Cummings & Lockwood, Stamford, Conn., for defendants C. Russell Feldmann and others.

Gumbart, Corbin, Tyler & Cooper, New Haven, Conn. (Morris Tyler and Richard H. Bowerman, New Haven, Conn., of counsel), for defendant Newport Steel Corp.

HINCKS, District Judge.

### Findings of Fact

#### I.

1. The plaintiff Jane Perlman and the plaintiff-intervenor Harry Mernoff are citizens of the United States and of the State of New York. The other plaintiffs are all citizens of the United States and of the State of Illinois. The plaintiffs each own shares of the common stock of Newport Steel Corporation which they acquired prior to August 31, 1950.

2. The defendant Newport is a corporation duly organized and existing under the laws of the State of Indiana, and thus a citizen of that state. The other defendants are all citizens of the United States and of the State of Con-

necticut and were such at and prior to the commencement of this action.

3. The amount in controversy exceeds $3,000, exclusive of interest and costs.

4. This action is not brought collusively to confer on the court jurisdiction it would not otherwise have.

5. The plaintiffs bring this action derivatively on behalf of Newport.

6. As of August 31, 1950 Newport had issued 1,221,870.2 shares of its common stock of the par value of $1 per share. Of these, 100,000 shares were owned by an almost-wholly-owned subsidiary of Newport, the R Company, and 43,378 shares were treasury stock. The balance of 1,078,492.2 shares were outstanding in the hands of the stockholders of Newport.

7. On August 31, 1950 the following persons or corporations owned the following number of shares of the common stock of Newport:

| | |
|---|---:|
| C. Russell Feldmann............. | 0 |
| Charlotte M. Feldmann.......... | 2,000 |
| Strong, Carlisle & Hammond Co... | 261,000 |
| Henney Motor Co., Inc........... | 50,000 |
| Carolyn F. Otto................ | 7,300 |
| Barbara Jane Feldmann.......... | 7,800 |
| Phyllis F. McKee............... | 7,300 |
| John F. Otto................... | 2,200 |
| Joseph V. McKee, Jr............. | 2,525 |
| Norman S. Feldmann............ | 1,000 |
| Raymond D. Feldmann.......... | 1,050 |
| John C. Vega............:...... | 600 |
| Josephine V. Vega.............. | 600 |
| | 343,375 |

Strong, Carlisle & Hammond Co. is a corporation approximately 85% of the stock of which was owned by C. Russell Feldmann (hereinafter called "Feldmann") and members of his family. Henney Motor Co., Inc. is a corporation the stock of which was owned 60% by Feldmann, and 10% each by his wife, Charlotte M. Feldmann, and by his three daughters. John F. Otto and the defendant Joseph V. McKee, Jr. are Feldmann's sons-in-law. Defendants Carolyn Otto, Phyllis McKee and Barbara Jane Feldmann are Feldmann's daughters. Norman S. Feldmann and Raymond D. Feldmann are Feldmann's brothers. John C. Vega and Josephine V. Vega are Feldmann's brother-in-law and sister-in-law, respectively.

8. The remaining 735,117 shares of Newport stock were owned by several thousand shareholders. Newport stock was traded over-the-counter in New York. Although it is impossible to determine the actual volume of trading in the stock, it apparently enjoyed a broad, fair and active market.

9. The 343,375 shares owned by Feldmann, his family, the Strong, Carlisle & Hammond Co. and the Henney Motor Co. amounted to approximately 33% of the outstanding stock of Newport. If voted as a unit, under the conditions existing as of August 31, 1950, this amount of stock would have given the holder working control of Newport.

10. Since December, 1940 and until August 31, 1950 Feldmann was the president of Newport. In August, 1950 he was also the chairman of its board of directors. His salary was $75,000 a year. The other four members of Newport's board of directors in August, 1950 were the defendant Joseph V. McKee, Jr., Feldmann's son-in-law, Frank L. Taylor, A. F. Lorenzen and Daniel M. Sheaffer.

## II.

### Newport's Facilities and Competitive Position

11. Prior to August 8, 1946, Newport, then known as International Detrola Corporation, was in the business of manufacturing radios and phonographs, aircraft components, refrigerator units, radio cabinets and radio speakers.

12. In late 1949 Newport disposed of its subsidiaries the Rohr Aircraft Corp., the Universal Cooler Co. of Canada, Ltd. and the Aircraft Tool Division. These subsidiaries had accounted for substantial portions of the company's sales and profits during 1948 and 1949.

13. In August, 1950, the principal business of Newport was the production

of steel ingots and the manufacturing of hot rolled steel and sheet steel. Through its Caswell-Runyan Division Newport manufactured cabinets for radio and television sets; through its Universal Cooler Division it manufactured refrigerator compressors. It also had a blast furnace for the production of pig iron, located at Martins Ferry, Ohio. It also owned real estate in Detroit, Michigan.

14. The Caswell-Runyan (woodworking) Division as of August, 1950 consisted of a plant at Huntington, Indiana, which had about 500,000 square feet of floor space, many acres of land, and practically all new equipment, and a plant at Goshen, Indiana, consisting of 125,000 square feet of floor space.

15. Prior to August 31, 1950 Newport had planned to sell its Universal Cooler Division, and had made serious attempts to sell it. It was actually sold on October 31, 1950.

16. Prior to August, 1950 Newport's property in Detroit had been unoccupied for two years. During August, 1950 Feldmann negotiated a lease of the property to the Government, at an annual rental of $165,000. The Government went into possession under the lease on August 14, 1950. The term of the lease was ten years and was to be extended from year to year for a period of five years unless terminated by the Government. The lease was renewed by the Government for another year on August 30, 1951. Under the lease, the Government had an option to buy the property from Newport for the price of $1,500,000, minus $191,000 of prepaid restoration charges.

17. Newport first entered the steel business in 1946. It then acquired for approximately $1,665,000 the assets of the Andrews Steel Co., located at Newport, Ky., directly across the Ohio River from Cincinnati, and at Wilder, Ky., about one mile south of Newport. The facilities acquired from Andrews consisted of about 200 acres of land, about 1,250,000 square feet of buildings with cranes and auxiliary equipment, together with seven open hearth furnaces, a blooming and bar mill, a sheet mill and facilities for fabricating culvert pipe, eaves troughs, down spouts, garage doors and roofing, and equipment for making galvanized, galvannealed and terne sheets. These facilities were and are used by Newport as part of one continuous operation: the open hearth furnaces make steel ingots, which are rolled into bar stock in the blooming and bar mill which in turn is rolled into sheets in the sheet mill. The normal product of the sheet mill is hot rolled, low carbon steel sheets. These sheets can be sold as such; or further processed by Newport into galvanized, galvannealed and long terne sheets; or fabricated by it into finished end products such as culvert pipes, eaves troughs, etc. The mill also produces sheets of silicon steel, a specialty steel used in electrical equipment, as well as an alloy steel which is used by aircraft manufacturers in building air frames. These facilities acquired from Andrews are known collectively as the "old facilities." They have been in operation ever since their purchase.

18. On March 31, 1947, Newport acquired a blast furnace located at Martin's Ferry, Ohio, at a cost of $175,000. Newport then rehabilitated the blast furnace at a cost of $800,000 and it was put into operation in June, 1947. It was taken out of operation in June, 1949, and put back into operation again in June, 1951.

19. The blast furnace has a rated capacity of 12,000 tons of pig iron per month. Its sole usefulness to Newport lies in the fact that it is capable of supplying 100% of the pig iron requirements of Newport's seven open hearth furnaces. In periods of shortage of pig iron, Newport's open hearth furnaces might not be able to operate without pig iron from the blast furnace. At any other time it would not be economically sound for Newport to operate the furnace. It is a marginal operation.

20. The open hearth furnaces have a rated capacity of about 34,400 tons of ingots per month and produce an average of 24,000 tons per month. The sheet mill

has a rated capacity of 15,000 tons per month, but has exceeded that capacity. The average monthly production of the sheet mill was 11,906 tons in 1949 and 11,834 tons in 1950. The production of the sheet mill in the following months was:

| 1950 | Tons |
| --- | --- |
| January | 12,859 |
| February | 8,750 |
| March | 13,080 |
| April | 11,815 |
| May | 13,000 |
| June | 11,189 |
| July | 5,980 |
| August | 12,704 |

(Defendant's Ex. 32)

21. The "old facilities" are capable only of high cost operation.

22. With respect to Newport's "old facilities": Newport's mill price for hot rolled sheets, 18 gauge and heavier, was, in August, 1950, $11–$27 per ton higher than the prices charged by certain other steel companies. In August, 1950, the prices charged by Newport for galvanized steel was $13 to $20 per ton higher than those charged by certain other steel producers. Newport's prices in August, 1950 for electrical, motor, dynamo and transformer (silicon) steel were the same as those charged by other producers.

23. It is unlikely that Newport would be able to sell hot-rolled, low-carbon steel sheets produced by its "old facilities" at a profit if the index of steel production fell to the level of mid-1949 (81%). However, it would probably be competitive with any other mill in the fields of alloy and silicon steel. No other mill in the Cincinnati area produces galvanized steel; the market for galvanized steel is local and Newport concentrates on the area within 100 miles of Cincinnati and to the south. Within that area Newport has a freight advantage which might permit it to sell some or all of its galvanized steel at a profit, even if the index of steel production fell to the level of mid-1949. In August 1950 Newport's profits from its "old facilities" were accounted for as follows: app.

33.8% by sales of hot-rolled, low-carbon sheets; app. 14.6% by sales of coated sheets (galvanized, etc.); app. 21.5% by sales of alloy and silicon steel; app. 25.5% by sales of the fabricating departments, which make doors, etc.; and app. 3.2% by other items. Newport's management believes that if a drop in demand for steel occurred, the profits of its "old facilities" could be maintained by shifting its production and sales away from low-carbon sheets. Yet it appears that in 1949, when Newport's sales of steel were cut in half as a result of a drop in demand and the company suffered a loss for some months, no such shift was made. On the basis of the past history of these facilities, it is questionable whether they could be operated profitably if the index for steel production fell to 80% or lower.

24. Between 1948 and 1950, Newport acquired additional steel facilities, referred to as the "new facilities", consisting of a melt shop containing one electric furnace, acquired from the War Assets Administration in the spring of 1948; two additional electric furnaces installed in the melt shop which were put in operation in March and May, 1950; an additional large building acquired from the War Assets Administration in the spring of 1948; and a reversing hot strip mill for the production of hot rolled steel strip, installed in said building in late 1948 and early 1949. These facilities, together with the pipe mill, referred to infra, were intended to be and are operated as a unit. They are adjacent to Newport's old facilities in Wilder, Ky. The facilities acquired from the War Assets Administration were obtained at a price of $1,350,000. Feldmann had been informed that these facilities had cost the Government $7,000,000 to build during the war. The final cost to Newport of its "new facilities", as they existed when completed, was $10,798,000.

25. Although Newport's "new facilities" were originally scheduled for completion in August, 1948, the actual completion was long delayed and they had never achieved their expected normal production by August 31, 1950.

26. The electric furnaces have a theoretical rated capacity of 24,300 tons of ingots per month; they were expected to have a normal monthly production of 22,000 tons per month. The last of the three furnaces was placed in production in May, 1950. Actual production during the four months starting in May was as follows:

| Month | Tons of Ingots |
|-------|----------------|
| May, 1950 | 14,963 |
| June, 1950 | 15,984 |
| July, 1950 | 15,072 |
| Aug., 1950 | 16,506 |

27. The theoretical rated capacity of the strip mill was 25,000 tons per month although it was capable of producing somewhat more. If all the normal 22,000 per month output of the electric furnaces were put into the strip mill, 18,700 tons of sheet and coil would be produced as the yield of the strip mill is 85%. Additional strip mill production might perhaps be obtained by converting ingots bought from other mills or furnished by customers. The strip mill first went into production in May, 1949 but until December, 1949 it never produced more than 5,500 tons per month. Its actual production from December on was as follows:

| Month | Tons of Strips & Coils |
|-------|------------------------|
| December, 1949 | 6,611 |
| January, 1950 | 5,329 |
| February, " | 7,108 |
| March, " | 11,129 |
| April, " | 10,475 |
| May, " | 9,140 |
| June, " | 12,827 |
| July, " | 7,967 |
| August, " | 16,314 |

During these months none of the strip mill's production was obtained from ingots furnished by customers or purchased from other mills.

28. As of August, 1950 it was reasonable to assume that the new facilities would soon attain their expected normal monthly production.

29. In contrast to open hearth furnaces which use pig iron as part of their "charge", the raw material used in electric furnaces is scrap. Steel produced by electric furnaces is of better quality than steel produced by open hearth furnaces.

30. At the time that the "new facilities" were first contemplated, i. e., app. January, 1948, it was estimated that Newport's scrap costs per ton would be at least five dollars higher than the "Big Six". As of August, 1950, however, Newport was paying the same amount for scrap as the "Big Six".

31. Newport's reversing strip mill is a modern automatic mill, one of the first of its type, although similar mills have since been built by other steel companies. It compares favorably with the new strip mill of Crucible Steel Co., which is a competitive mill.

32. At the time that the "new facilities" were first contemplated it was estimated that Newport's costs in operating them, aside from raw material costs, would be about five dollars per ton higher than the "Big Six" when the facilities were operating a full normal production. As of August, 1950 Newport's actual conversion costs were slightly higher than those of the "Big Six." Unit costs tend to decrease as a steel mill approaches capacity production.

33. The big steel mills, like those of the "Big Six", are the principal competitors of Newport's new steel facilities. In August, 1950 Newport charged the same base price for its hot rolled sheets produced by the new facilities as was charged by the lowest priced steel producers for the same product and Newport's prices for extras were likewise the same. No other steel producer sold the same product at a lower price and some charged higher prices. However, most of Newport's August production was committed to General Motors Corp. In December, 1949, Newport gave General Motors a continuing option effective until June, 1953 to purchase 10,000 tons of steel a month from the new facilities at "Big Six" prices. The option was still in effect in August, 1950.

34. The market for hot rolled steel in coil and cut lengths in the area within 150 miles of Cincinnati is five to seven times Newport's capacity production of that product. Within that area, as against the "Big Six", Newport has the advantage of lower freight rates which, since steel prices are F. O. B. mill, might enable Newport, at a time when the index of steel production in the United States is 90–95%, to sell all the production of its new facilities, even if Newport's prices were $4 or $5 per ton higher than the "Big Six."

35. In March, 1950, Newport purchased a slightly used pipe mill from International Rolling Mills Products Corp. for $450,000. The pipe mill, which had not yet been placed in operation in August, 1950, was intended to use steel produced by the hot strip mill, and as of that date the cost of the pipe mill to Newport—and its book value—stood at $491,763.00.

36. At the time of purchase the future earnings of the pipe mill were estimated by a firm of management engineers to be $100,000 to $150,000 a month. It had a rated capacity of 3,000 tons per month, but Newport's general manager of its steel division, Mr. Riefkin, had estimated that it "should" produce 4,000 tons per month. In order to produce 4,000 tons of pipe, Newport would have to supply the pipe mill with 4,500 to 4,700 tons of coil from its strip mill. It was estimated that Newport would realize a profit of $30 per ton on sales of pipe at competitive prices. The mill did not actually go into production till March, 1951.

### III.

#### "Feldmann Plan" Financing

37. In the 10-year period prior to August, 1950, the steel industry in the United States was, with the exception of a short period in 1949, in a boom condition. There was a scarcity of steel in 1946, 1947 and 1948 as well as during the summer of 1950; the market for steel was tight throughout the year 1950 and continues to be tight. In July and August, 1950, the demand for the steel produced by Newport far exceeded its then capacity.

38. Newport raised the money to purchase its "old facilities" from the Andrews Steel Co. by borrowing from banks. Shortly after acquiring these facilities Newport entered into contracts with seven of its customers pursuant to which Newport agreed to sell and the customers to purchase certain quantities of steel over a period of 36 months at a total contract price of $35,100,000 (except that Borg-Warner agreed to take its share of the steel over an 18-month period). The amount of steel committed represented 50% of Newport's expected production. In consideration of this commitment, the customers advanced an aggregate of $3,510,000 to Newport. These advances were free of interest and were to be amortized against 10% of the price of the steel to be delivered. Part of the $3,510,000 thus obtained was used to pay off $2,000,000 of the bank loans and the rest was used for working capital.

39. In January, 1948 Newport, under the management of Feldmann, received advances of $5,000,000 from three customers, Packard Motor Car Co., Borg-Warner Corp. and Houdaille-Hershey, to be used in the purchase and installation of its "new facilities." The advances were made under the terms of contracts which provided that Newport would ship and the customers would purchase specified quantities of steel from the "new facilities", half during an 18-month period beginning August 1, 1948 and the balance during the following eighteen months. The steel was to be paid for at the average base price quoted by the "Big Six" steel companies and, in addition, the purchasers were to pay a premium of $20 per ton of steel shipped during the first 18 months.

The contracts provided that Newport was to be obligated to repay the advances of $5,000,000 at the end of the first 18-month period and until then they were not to bear interest. The contracts further provided that the $20 per ton premium above "Big Six" prices on steel de-

livered during the first 18 months was to be credited against the amount of the advances, and the contract arrangements were such that, if Newport delivered the full amount called for during that period, the $5,000,000 in advances would be considered completely repaid. If Newport's steel shipments should be interrupted by causes beyond its control for any period, the initial 18-month period for the repayment of the advances was to be correspondingly extended. However, with certain limitations, if Newport did not meet its contract commitments as to delivery schedules and quality of steel, the customers could refuse to accept any further steel and thus deprive Newport of its opportunity to have the advances cancelled through shipments of steel. There was no provision for an acceleration of the due date of the advances, which were made subject to Newport's outstanding debentures. Furthermore, Newport, in case of an inability to make the required shipments from its "new facilities", had the right to substitute steel produced by the "old facilities", at least for a period of six months.

40. On December 6, 1948 Newport entered into a contract with General Motors Corp. under which General Motors agreed to and did advance to Newport $5,000,000 on terms similar to the Borg-Warner etc. contracts.

41. It is customary for costs to be high during the first year or year and a half of operation of a new type mill. In addition, in planning Newport's new facilities, it was estimated that Newport's costs would probably always be higher than those of the "Big Six".

42. Due to difficulties in getting the strip mill into production, Newport was unable to make the deliveries called for in the loan contracts, and by early 1949 was hopelessly behind in deliveries. Out of the $10,000,000 borrowed, approximately $1,200,000 was earned by the $20 per ton fees on steel delivered, leaving a balance of $8,799,076.87 owing. Since Newport was in default under the contracts, the lenders were demanding their

money. Feldmann negotiated a settlement of this indebtedness by payment of $4,399,538.50, together with an option to General Motors for 10,000 tons of steel per month until June, 1953. Newport raised the money to make this payment by the sale of Universal Cooler of Canada, Rohr Aircraft Corporation, and its Aircraft Tool Division.

43. In March, 1950, as part of the same agreement by which it purchased its pipe mill for $450,000 from International Rolling Mills Corp., Newport granted International an option to buy from it, at its mill prices, substantial amounts of steel for a specified period of time. Under these options International thereafter purchased an aggregate of 28,833 tons of steel from Newport at its mill prices.

44. The method of financing the acquisition and operation of steel facilities by obtaining advances from steel customers—the advances being given in consideration for steel commitments undertaken by the steel producer—was originated by Feldmann and to some extent has been adopted by other steel companies. It is known in the steel industry as the "Feldmann Plan."

IV.

The Follansbee Merger
Negotiations

45. The end product of Newport's new steel facilities is known as hot rolled sheet or hot rolled coil. While this is a marketable commodity, it is often further processed by a so-called "cold rolling" process. A cold rolled sheet has a finer finish and a lighter gauge than a hot rolled sheet and is used principally for more difficult work. As of August, 1950, Newport had no cold rolling facilities.

46. In the summer of 1950, if such facilities could have been obtained at a price and under terms which were advantageous to Newport, it might have been desirable for Newport, and Feldmann so understood, to install cold rolling facilities in order to give Newport a more fully integrated operation. The cost of

installing cold rolling facilities would have been at least five to ten million dollars, which Newport did not have.

47. Newport commenced negotiations with Follansbee Steel Corporation in May, 1950, looking toward a merger of the two companies. Newport was interested in acquiring cold rolling facilities with known costs, and without the delays and risks attendant upon building a new mill, if that could be on advantageous terms. Follansbee had such facilities, but would not consider an exchange basis less favorable to it than 1¾ shares of Newport for one share of Follansbee. Feldmann stated that a merger on the basis of 1¾ to one would not be in the best interests of Newport and all its stockholders, and took the position that a fair and proper exchange ratio should be 1½ to one; Ruttenberg, the broker promoting the deal, agreed that Feldmann's position was a reasonable one, although he tried to influence Feldmann to consider the Follansbee suggestion by pointing out that Feldmann would personally profit substantially thereby. Follansbee never made a firm offer of merger on any basis and Follansbee's Board of Directors decided on July 11, 1950 against a merger on a basis of 1½ to 1. On July 12, 1950, Follansbee and Newport mutually agreed to suspend the merger negotiations until October 31, 1950 since they were unable to agree on terms. In addition to the unfavorable merger terms suggested by Follansbee, Newport had serious operational objections to the merger, based upon the distance of the Follansbee mill from Newport and the incompatibility of its equipment. On July 28, 1950, Newport's Board of Directors unanimously approved the suspension of the negotiations for an indefinite period.

48. The common stock of Follansbee was listed on the New York Stock Exchange. During May, June and July, 1950, while the merger negotiations between Follansbee and Newport were under way, the market price of Follansbee common stock was approximately $16 per share.

49. With the outbreak of the Korean war, there was a possibility that the Government might advance the money to Newport to put in cold rolling facilities on its own property and give Newport priorities to expedite the construction, as was done in World War II.

## V.

### The Sale of Stock to Wilport

50. During the late spring and early summer of 1950, when as above stated the steel market was tight, Feldmann began receiving numerous inquiries from persons interested in a possible purchase of his stock interest in Newport. One such inquiry, in June or July, 1950, was from a Mr. Barney Hokin, the president of International Rolling Mill Products Co., who asked if Feldmann would take $20 a share for his stock. Another such inquiry was from Mr. Ruttenberg, a broker, who on June 6, 1950, inquired as to whether Feldmann would accept $10 a share.

51. On August 8, 1950, Sidney Coe of Irving Trust Company called Feldmann on behalf of William J. Mericka and asked Feldmann if he would meet with Mericka, whom he described as a very substantial person, who had previously been substantially interested in Empire Steel Company. Mericka is president of William J. Mericka & Co., investment securities dealers in Cleveland, and chairman of the Executive Committee of the Bingham-Herbrand Corporation, which makes stampings and forgings. Bingham-Herbrand is an "end user" of steel, i. e., a company requiring steel for the manufacture of its products. Feldmann had not previously met Mericka but had heard the name of Mericka & Co. mentioned favorably many times.

52. On August 9, Feldmann and William Alfs, a Vice-President of Newport and Feldmann's personal counsel, met with Mericka and Frank Cobourn in Detroit. Cobourn is a partner in a Toledo law firm and counsel for A. P. Parts Corp., an end user of steel. Mericka told Feldmann that he represented a group of end users of steel which might be

interested in acquiring all of Feldmann's holdings in Newport Steel. The group then consisted of Gibson Refrigerator Co., Mitchell Manufacturing Co., Prentiss-Wabers Co., A. P. Parts and Bingham-Herbrand. Feldmann indicated that he might consider selling to such a group and said that he would not consider less than $22 per share.

53. The dominant motive of the purchasing group in seeking to purchase Feldmann's controlling stock interest in Newport was to obtain a continuing source of steel supply. Feldmann knew during the negotiations that such was their motive.

54. On August 9, 1950 the price of Newport's common stock was quoted in the over-the-counter market at 8¼ bid 9 asked. Feldmann stated, however, that he thought the true value of the stock was much higher than that, and even higher than its book value of $17.03, because there were intrinsic values not reflected by the books and because of the improving future outlook for Newport.

55. Feldmann talked again with representatives of the purchasing group on August 10, August 14, and August 24, 1950.

56. During the course of these talks the parties discussed in some detail Newport's business, including contractual agreements, earnings, the values of the divisions, and personnel. Feldmann recommended that, if he sold his stock, every officer should be kept in his present position since they were a fine operating organization. Feldmann stated that in his opinion the steel division was undervalued on the books to the extent of $6,000,000 or $7,000,000 and the Detroit property by at least $1,000,000. He stated also that Caswell-Runyan was undervalued, since the fixed assets were on the books at only $600,000.

57. Among the subjects covered in the negotiations were the following: What could Newport manufacture that would be helpful to an end-product user such as the members of the purchasing group? What was the type of steel produced by Newport? What were the existing contractual commitments of Newport for the sale of steel? What steel would be available to the purchasing group when and if the existing commitments expired? Feldmann furnished information on these points in response to questions by the representatives of the purchasing group.

58. During the course of negotiations Feldmann stated that if he were to sell his stock, it would be to a group of the sort represented by Mericka and Cobourn, who, he stated, because they were end-users of steel, were likely to be customers for Newport's steel when steel demand was low. It was Feldmann's sincere belief that stock-ownership in end-users would lend stability to Newport.

59. Feldmann made arrangements for Mericka to visit Newport and inspect the plant. Mericka did so on August 16 and returned again on August 22 with other members of the purchasing group, as well as Mr. James H. Hill, a top flight operating man in the steel industry. Mericka, Hill and the rest were all much impressed by Newport's steel facilities.

60. During the negotiations, representatives of the accounting firm of Seidman & Seidman examined Newport's financial records on behalf of the purchasers. However, they did not audit the books.

61. During the negotiations, Feldmann instructed Newport's general counsel William A. Alfs, Newport's chief financial officer Harry E. Hamilton, and the manager of Newport's steel division Carl M. Riefkin, to furnish to the purchasing group any facts or figures they might request. All information requested by the purchasing group was furnished, including information respecting existing commitments, expiring dates and new production. At Feldmann's request, Riefkin prepared an estimate of Newport's uncommitted production for the balance of the year 1950, which was delivered to the purchasing group.

62. During the negotiations the representatives of the purchasing group stated that they intended to go forward with the policy, previously decided on by Feldmann and his associates, of causing Newport to sell off its divisions not engaged in the manufacture of steel.

63. On August 24 Feldmann went to Chicago for a meeting with Cobourn and Mericka. He first went to two banks in order to inquire about Frank Gibson, Charles Gibson and Gibson Refrigerator Co. on whom he received very favorable reports from both banks. Feldmann then went to the Ambassador East Hotel where Alfs, Cobourn and Mericka were waiting. Mericka said that he and Hill had both been very impressed by Newport. Mericka said also that in order to pay for the minimum number of shares that Feldmann was willing to sell, it would be necessary to expand the purchasing group. Feldmann asked who would be in the final group and Mericka stated that the group had not yet been finalized, but Maytag Washing Machine Co. and Hudson Motor Car Co. would undoubtedly be members, and that the group would be composed only of responsible companies who were end-users of steel. Mericka then offered $18 per share for approximately 400,000 shares on the basis of a short term option for half the stock and a 30 to 60 day option for the other half. Feldmann refused the offer. Cobourn then reported back to other members of the purchasing group while Mericka remained with Feldmann. Mericka, after talking with Cobourn on the telephone, offered Feldmann $20 per share. Feldmann accepted this offer.

64. Prior to the drawing up of an option agreement, the parties also reached an informal understanding as to the following matters: (a) if the purchasing group were to exercise only half of the option, it would then be entitled to one representative on the Newport Board of Directors; and (b) if the option were exercised in its entirety, Feldmann would then resign as an officer and director of the corporation, procure the resignation of his fellow directors and assist in the election as directors of the nominees of the purchasing group.

The option was to be assignable. Feldmann did not believe it necessary to restrict Mericka in any way as to the identity of the assignee since he considered Mericka a responsible individual who would adhere to his stated intention of assigning the option to the purchasing group previously identified. Mericka told Feldmann that three of the purchasing group's designees for the Newport Board of Directors would probably be Frank S. Gibson, Jr. (Vice President of Gibson Refrigerator Co.), Mericka and Cobourn, and that Gibson would probably succeed Feldmann as President and Chairman of the Board.

65. Alfs then wrote out the following option in longhand, which Feldmann signed:

"August 24, 1950

"William Mericka:

"For and in consideration of $100, receipt of which is acknowledged, I agree to sell to you 200,000 shares of Newport Steel Corporation for $4,000,000—at any time on or before August 31, 1950.

"If you exercise this option on or before Sept. 1, 1950, on the terms above set forth, I will give you at that time an option to buy an additional number of shares of Newport Steel Corporation, not less than 175,000 shares nor more than 200,-000 shares at $20. per share, until 12:00 noon E.S.T. Nov. 1, 1950.

"If you exercise the option to buy the shares (minimum 175,000, maximum 200,000) on or before Nov. 1, 1950, I will deliver to you, at the time you exercise the option, the resignation of all of the members of the Board of Directors of Newport Steel Corpn.

"(Signed) C. Russell Feldmann"

66. After August 24, 1950, and before August 31, 1950, Feldmann made private inquiry with respect to Cobourn, and was informed that Cobourn was a capable lawyer, of highest reputation.

In that period, he met Bernard Mitchell, President of Mitchell Manufacturing Company who had previously been associated with the Gibson Refrigerator Company in Appollo Steel Company.

67. On August 29, 1950, the purchasing group organized a Delaware corporation known as Wilport Company (hereinafter referred to as "Wilport"), for the purpose of purchasing and holding the Newport stock covered by the option agreement. Mericka assigned the option to Wilport. Between August 24 and August 30, 1950, the purchasing group was expanded to comprise sixteen members, all of them end users of steel. The group members paid an aggregate of $8,200,000 to Wilport to enable it to exercise the option, and received in return stocks and notes of Wilport ratably according to their contributions.

68. On or before August 31, 1950, the Wilport stockholders informally agreed among each other that they were to have the privilege of buying steel from Newport in proportion to their respective investments in Wilport. They intended, if possible, to buy about 15,000 to 20,000 tons of steel per month from Newport.

69. Mericka told Feldmann that he should be in Chicago on August 31, and should have his stock available, although there was no guarantee that the entire option would be exercised. On August 29 or 30 Alfs, who had been in frequent touch with Cobourn, told Feldmann that he and Cobourn had drafted a contract containing, among other things, a covenant which the purchasers insisted on, whereby Feldmann would agree not to compete in any business Newport was engaged in for five years. This provision was not envisioned by the option agreement, and Feldmann would not agree to inclusion of such a provision at first, but finally agreed to accept it as later modified.

70. On August 31, 1950 Feldmann went to Chicago, Ill. and at that time Wilport exercised the option which Feldmann had given to Mericka on August 24 and which Mericka had thereafter assigned to Wilport. Feldmann delivered to the Continental Illinois Bank 398,927 shares of Newport stock and Continental delivered to Feldmann, unconditionally, checks for $7,978,540 in payment of the stock at $20 per share and the sale was completed. These 398,927 shares (approximately 37% of Newport's stock) constituted a control block of Newport. At the time of the sale Feldmann executed the written agreement of sale previously drafted by Cobourn and Alfs. By the agreement, Feldmann warranted that Newport had given no steel commitments other than in the normal course of business, except certain commitments specially listed. The agreement contained no representation or warranty that the financial statements of Newport, which Feldmann had furnished to the purchasing group, were correct.

71. Among the 398,927 shares of Newport, which Feldmann sold and delivered to Wilport, were the 343,375 shares owned or controlled, directly and/or indirectly, by Feldmann and members of his family. The balance was made up by the shares of numerous friends and associates of Feldmann.

72. In addition to Feldmann himself and his family, all of Newport's directors participated in the stock sale to Wilport by selling the following numbers of shares at $20 per share:

J. V. McKee, Jr............. 2,525 shares
D. M. Sheaffer............. 5,000 "
F. L. Taylor............... 2,600 "
A. F. Lorenzen............. 1,010 "

73. In the selling of the 398,927 shares of Newport to Wilport, Feldmann acted for himself and as agent of the owners of said shares, including defendants Charlotte M. Feldmann, Joseph V. McKee, Jr., Phyllis McKee, Carolyn Otto and Barbara Jane Feldmann.

74. After the consummation of the sale Feldmann convened a special meeting of Newport's board of directors. Three of Feldmann's co-directors, namely, McKee, Lorenzen and Sheaffer (who resided, respectively, in Connecticut, in Miami, Fla., and in Philadelphia, Pa.)

were present. Feldmann had with him the signed resignation of Newport's fifth director, Taylor. Immediately prior to the meeting Feldmann was for the first time informed of the identity of the full slate of directors proposed by Wilport, namely Frank Gibson, Mericka, Cobourn, Paxton and Mitchell. Feldmann knew that Paxton was a member of a well known, reputable, Chicago law firm and general counsel to Gibson Refrigerator Co.; Alfs had previously spoken favorably of him. After the meeting was convened the directors of Newport successively resigned and, as each vacancy arose, the Board elected successively as new directors Frank Gibson, Paxton, Cobourn, Mericka and Mitchell; Feldmann voted for each of the directors except Mitchell.

75. Each of the new directors of Newport was a director of Wilport.

76. At the aforesaid meeting of Newport's board of directors on August 31, 1950, Feldmann also resigned in his capacity of chairman of the board and president of Newport. Alfs resigned as vice-president and general manager of Newport and Hamilton resigned as secretary of Newport. Newport's new board of directors then elected the following: Gibson, chairman of the board of directors and president of Newport; Mericka, vice-president; Paxton, secretary and counsel; and Hamilton, assistant secretary. Some time after August 31, Mitchell was elected vice-president of Newport. Feldmann and Alfs were the only two officers of Newport who served prior to August 31, 1950 who are no longer officers of Newport.

77. At no time did Feldmann or any defendant intend or attempt to work any harm to Newport or to its other stockholders through joint or several action amongst themselves or in concert with the members of the Wilport group.

78. Neither Feldmann nor any other defendant, whether in fiduciary capacity or otherwise, failed to use all reasonable care in connection with the sale of their stock in preventing harm to Newport and other stockholders.

## VI.

### Wilport's Need for Immediate Control of Newport

79. As of August, 1950, all steel orders accepted by Newport, other than long-term contractual commitments, were expected to be filled in the normal course by December 31, 1950. The only long-term contractual steel commitment of Newport, scheduled to extend beyond December 31, 1950, was its contract with General Motors Corporation, dated December 12, 1949, under which General Motors had an option to buy up to 10,000 tons of steel per month until June 30, 1953.

80. As of August 24, 1950 Riefkin, the general manager of the steel division, estimated that Newport would have available, over and above the amounts already committed, 4,830 tons of strip and 6,900 tons of ingots from its November production and 6,000 tons of strip and 9,800 tons of ingots in December.

81. During July and August, 1950 it would have been possible for Newport to commit all of its open production to customers in the ordinary course of trade for a period extending into 1951 at the mill prices prevailing at the time of delivery. Considering the past history of Newport's business and the condition of the steel market as of then, it is not unreasonable to assume that Newport might have been able in July and August, 1950, to make long range contractual commitments for substantial portions of its expected production during the next year or two.

82. As of August, 1950 Newport did not normally accept orders more than ninety days in advance of delivery.

83. During the eight months preceding August 31, 1950, six members of the purchasing group (Grand Sheet Metal Products Co., Acklin Stamping Co., Prentiss-Wabers Products Co., Webster Chicago Corporation, A. P. Parts Corp. and Motorola Inc.) had been steel customers of Newport. In no one of these months had these firms been able to buy an aggregate of more than 500 tons of steel

from Newport although all customers of Newport during that period had tried to buy larger amounts of steel.

84. It was important to the purchasers of Feldmann's stock, in order to make available to themselves as soon as possible the maximum amount of steel from Newport, to obtain the immediate resignation of the officers and directors of Newport; otherwise it would have been legally possible for the old management to make commitments to others. It was desirable for the purchasers to obtain the substitution of their own nominees as directors so that they could immediately determine Newport's sales policy, control commitments for Newport's steel and determine the prices and terms of sale without the expense and delay of holding a special stockholders' meeting to fill the vacancies on the board.

85. Feldmann made no effort to obtain for the other stockholders of Newport a price for their stock similar to that which he received and which he made available to certain of his personal friends, relatives, associates and to officers and directors of Newport, nor did he make any misrepresentations either to other stockholders or to others in connection with his sale.

## VII.

### The Effect of the Sale on Newport

86. During the summer of 1950 and thereafter, to the knowledge of Feldmann various steel producing companies other than Newport received from end-users of steel large advances of the "Feldmann Plan" type in return for agreements to sell steel to them. Thus Jones & Laughlin Steel Corp. borrowed $28,-000,000 from General Motors Corp. in June of 1950; Republic Steel Co. borrowed $40,000,000 from General Motors Corp.; Pittsburgh Steel Corp. borrowed $8,000,000 from Chrysler Corp. and $2,-000,000 from Packard Motor Car Co.

87. Whether or not, in August, 1950, Newport's position was such that it could have entered into "Feldmann Plan" type transactions to procure funds and financing for the further expansion and integration of its steel facilities and whether such expansion would have been desirable for Newport, the evidence does not show.

88. During the summer of 1950, Feldmann made no effort to explore the possibility of obtaining from end-users of steel funds or advances of the "Feldmann Plan" type in return for an undertaking by Newport to sell its uncommitted excess production of steel.

89. Feldmann never inquired from Mericka or Cobourn or any other member of the purchasing group whether it would be possible to obtain from the purchasing group an advance to Newport of the "Feldmann Plan" type in return for a commitment by Newport to sell steel to them.

90. In August, 1950, the state of the steel market was such that a loan to Newport on favorable terms would have constituted a cloak to conceal an unethical gray market transaction if conditioned on a commitment of output from existing facilities as distinguished from new facilities to be financed by the loan.

91. Since the Wilport group were end-users of steel who intended to divert some of Newport's steel production to themselves, Feldmann's sale of a control block of Newport stock to Wilport might have been expected to result in a management less willing to make a commitment of output of facilities existing as of August, 1950 in return for customer loans. The mere fact that Newport's new directors and officers might have interests as end-users would not constitute incentive to stifle desirable expansion financed by commitments *upon new facilities*.

92. None of the members of the Wilport group was located within 150 miles of Newport's plant; some were as far away as 750 miles.

93. Since the Wilport nominees took over the management of Newport on August 31, 1950, substantial improvements have been made in Newport's property and the corporation has enjoyed con-

tinued prosperity. Although the Wilport stockholders have purchased substantial quantities of steel from Newport, no sales were made at less than Newport's quoted mill prices. There is no evidence of any sort that Newport has suffered from mismanagement or inefficient management since August 31, 1950, or that it has suffered or is likely hereafter to suffer any harm whatever at the hands of its new management, or that its new management has in any way failed to do anything which should have been done for the good of the corporation.

## VIII.

### Value

94. Between August 28 and August 30, 1950, Feldmann purchased for his family members and for Mary Hayward (his secretary) and Nora E. Hertzfeld (daughter of Newport's counsel William A. Alfs) a total of 14,800 shares of Newport at prices ranging from $9.69 to $12 per share. Feldmann purchased most of these shares from three close friends of his. Feldmann's said family members as well as Mary Hayward and Nora E. Hertzfeld promptly resold these 14,800 shares to Wilport at $20 per share, as part of the 398,927 block sold by Feldmann. Their total profit on these 14,800 shares was $132,070.

95. One or two days before August 31, 1950, Mericka, at Feldmann's request, bought 1,000 shares of Newport for the account of Riefkin, the manager of Newport's steel division, at approximately $11 per share. These shares were then sold for Riefkin's account by Feldmann to Wilport as part of the block delivered by him at $20 per share. Riefkin received a profit of slightly over $9,000 from this transaction, without any investment on his part.

96. On August 24, 1950 Newport stock was quoted on the over-the-counter market at 8½ bid, 9½ asked. On August 31, 1950 the quotations were 10⅝ bid and 11⅝ asked. Between August 28 and August 30, 1950 relatives, friends and associates of Feldmann purchased at least 3,000 shares of Newport stock in the market.

97. During the nine months preceding August 31, 1950, transactions involving substantial amounts of Newport stock included the following:

(a) In December, 1949, Newport sold the assets of its subsidiary, Rohr Aircraft Corporation, for $5,600,000. The buyer was a corporation organized by F. H. Rohr and J. E. Rheim, former directors of Newport, and their associates. The purchaser obtained and exercised an option to deliver 100,000 shares of Newport stock in lieu of $500,000 of the purchase price, i. e., at the rate of $5 per share. At that time, the book value of the shares of Newport was approximately $16.60 a share, only slightly less than their book value as of August 31, 1950, which was $17.03 a share.

(b) In December, 1949, Newport purchased from the manager of its Universal Cooler division 8,505 shares of Newport stock for a price of $50,000, amounting to $5.88 a share.

(c) On February 14, 1950, as of October 31, 1949, Newport sold the assets of its aircraft tool division in consideration of $500,000 cash and 10,000 shares of Newport stock which Newport took in at their then approximate market price of $7.50 a share.

98. Between August 28 and August 30, 1950, Feldmann purchased, for members of his family and friends,

2,000 shares of Newport stock from A. H. Sarver at $10 a share;

3,000 shares of Newport stock from F. S. McNeal at $10 a share;

7,800 shares of Newport stock from F. L. Taylor at $12 a share.

Sarver, McNeal and Taylor were friends of Feldmann; Taylor was also a director of Newport. At their request Feldmann fixed the prices paid them for their shares as the fair prices thereof.

99. The book value of Newport stock on August 31, 1950 was $17.03 per share.

100. The book value of the plant, property and equipment of Newport's

various divisions was, as of August 31, 1950:

| Division | Net Book Value |
|---|---|
| *Rolling Mill Division* | |
| Newport, Kentucky | $ 723,931 |
| Wilders, Ky.—Old Facilities | 441,955 |
| Wilders, Ky.—New Facilities | 10,315,894 |
| Pipe Mill | 491,763 |
| Martins. Ferry, Ohio | 819,186 |
| | $12,792,729 |
| *Refrigeration Division* | |
| Marion, Ohio (Universal Cooler) | $ 1,138,767 |
| *Radio Division* | |
| Detroit, Michigan | 367,630 |
| Huntington, Indiana (Caswell-Runyan) | 489,891 |
| Goshen, Indiana (Caswell-Runyan) | 190,642 |
| | $ 1,048,163 |
| | $14,979,659 |

These figures, it should be noted, are exclusive of inventories.

101. In 1951 the Manufacturers Appraisal Co. appraised Newport's steel facilities in order to determine their "cost of reproduction" and "sound value" as of May 31, 1951. In arriving at the "cost of reproduction" the company attempted to determine what it would cost to erect or purchase facilities or machines identical to those currently owned by Newport. Where identical machines were not then available the company took the price of the most nearly comparable machine of those then on the market. "Sound value" was determined in the case of each machine or facility by applying a percentage of depreciation. The percentage of depreciation was in almost all cases determined by a field appraiser employed by Manufacturers' Appraisal Co. who based his determination on what he believed to be the actual depreciation. It was the opinion of Manufacturers' Appraisal Co. that the reproduction cost and "sound value", respectively, of Newport's steel facilities as of May 31, 1951 were:

| | Cost of Reproduction | "Sound Value" |
|---|---|---|
| Sheet Mill—Newport (Old Facilities) | $14,359,366 | $ 8,576,510 |
| Steel Plant—Wilder (Old Facilities) | 21,454,195 | 12,429,604 |
| Wilder Section (New Facilities) | 18,861,024 | 15,686,344 |
| Blast Furnace (Martin's Ferry) | 4,833,132 | 3,290,804 |
| Total | $59,507,717 | $39,983,262 |

The cost of reproduction of these facilities as of August 31, 1950 was approximately 5% less than on May 31, 1951.

The "sound value" of Newport's steel facilities on August 31, 1950 was approximately $37,000,000.

### The Detroit Plant

102. In the nine months ending July 31, 1950 Newport had lost $63,933 on the Detroit property.

103. Under the lease entered into between Newport and the Government in August, 1950, which provided for an annual rental of $165,000, the net annual income to Newport after deduction of property taxes and insurance but not income taxes, would be $132,600.

104. If the Government, on August 31, 1950, had exercised its option to purchase the property for $1,500,000, minus $191,000 of prepaid restoration charges, the net proceeds to Newport would have been $1,073,658, after deduction of capital gains tax at the rate of 25%.

### Universal Cooler Division

105. The earnings, before taxes, of Newport's Universal Cooler Division in its business years 1948 and 1949 and in the ten months ending August 31, 1950 were:

| Years | Amounts |
|---|---|
| 1948 | ($643,261.02) Loss |
| 1949 | 37,295.92 |
| 1950 (10 months ending Ang. 31, 1950) | 112,767.11 |

106. Newport's Universal Cooler Division plant, property, equipment plus

inventory had a book value as of August 31, 1950 of $2,718,051. Prior to August 31, 1950, Newport planned to sell this Division, and had made serious attempts to sell it. On October 31, 1950 Newport's new management sold the Universal Cooler Division for slightly more than its then book value. If the additions to book value between August 31, 1950 and October 31, 1950 were deducted from the sales price, Newport received for the Universal Cooler Division slightly more than its book value as of August 31, 1950.

### Caswell-Runyan Division

107. The earnings, before taxes, of Newport's Caswell-Runyan division in its business years 1948 and 1949 and in the ten months ending August 31, 1950, were:

| Years | Amounts |
|---|---|
| 1948 | $195,180.21 |
| 1949 | 124,421.09 |
| 1950 (ten months ending Aug. 31) | 580,342.88 |

The earnings, before taxes, of Newport's Caswell-Runyan division in each of the first ten months of its business year 1950 were:

| | |
|---|---|
| November 1949 | $ 91,298.33 |
| December 1949 | 34,233.97 |
| January 1950 | 31,973.68 |
| February 1950 | 9,267.74 |
| March 1950 | 12,214.56 (loss) |
| April 1950 | 31,434.52 |
| May 1950 | 88,688.13 |
| June 1950 | 92,088.09 |
| July 1950 | 10,890.76 |
| August 1950 | 196,793.23 |

108. There was no substantial change in the operators, facilities, or market position of this division between January 1, 1948 and August 31, 1950.

### The Steel Division

109. Considering the condition of business generally, and the impact of the Korean war (beginning on June 25, 1950), it was reasonable to estimate in August, 1950 that the steel industry would produce at or above capacity for a minimum of two years, and probably for a longer period.

110. The earnings, before taxes, of Newport's rolling mill division in its business years 1948 and 1949 and in the ten months ending August 31, 1950, were:

| Year | Earnings before Taxes |
|---|---|
| 1948 | $1,907,925.17 |
| 1949 | 510,402.05 |
| 1950 (ten months ending August 31) | 271,846.59 |

111. The monthly sales and earnings before taxes of the rolling mill division November, 1948 through August, 1950, were:

| Month | Net Sales | Profit before Taxes |
|---|---|---|
| November, 1948 | $3,377,475.42 | $415,069.60 |
| December | 3,359,970.91 | 351,111.37 |
| January, 1949 | 3,785,863.62 | 339,401.93 |
| February | 3,312,710.27 | 319,368.51 |
| March | 3,069,271.24 | 292,807.67 |
| April | 2,323,597.29 | 121,865.99 |
| May | 1,785,394.83 | 81,918.64 (loss) |
| June | 1,662,869.73 | 304,418.45 (loss) |
| July | 1,419,692.75 | 330,305.04 (loss) |
| August | 1,839,328.60 | 241,181.33 (loss) |
| September | 1,284,191. | 129,683. (loss) |
| October | 2,813. | 241,716. (loss) |
| November | 1,191,356. | 266,024. (loss) |
| December | 2,122,654. | 205,274. (loss) |
| January, 1950 | 2,675,391. | 21,775. |
| February | 1,991,305. | 119,018. (loss) |
| March | 2,355,235. | 95,179. (loss) |
| April | 2,573,105. | 145,473. |
| May | 2,976,165. | 131,180. |
| June | 3,530,782. | 353,885. |
| July | 2,005,383. | 20,653. |
| August | 3,724,732. | 284,375. |

The division was completely shut down in October, 1949, by a strike, and partially shut down in July, 1949 and July, 1950 for employee vacations.

112. The earnings, before deduction of general expenses and taxes, of the "old steel facilities" of Newport's rolling mill division were:

| | |
|---|---|
| In April, 1950 | $189,407 |
| In May, 1950 | 244,047 |
| In June, 1950 | 408,520 |
| In August, 1950 | 331,559 |

The average monthly earnings during these four months were $293,383.

113. The production of the "old facilities" of carbon, silicon, alloy and coated sheets remained on approximately the same level throughout April, May, June and August, 1950. July, 1950, was a vacation month and the "old facilities" were shut down for two weeks during the month. As between June and August, 1950, production was higher in August in the case of each of the type of sheets produced by the "old facilities." Production of the open hearth furnaces also was slightly higher in August.

114. The earnings, before deduction of general expenses and taxes, of the "new steel facilities" of Newport's rolling mill division were:

June, 1950 ........ $ 67,794.00
August, 1950 ...... 111,991.00

115. If the electric furnaces which comprise part of the "new facilities" were to produce their "normal" monthly production of 22,000 tons and all of this production were utilized in the strip mill, Newport would then have 18,700 tons of hot strip and coil to sell. If this amount were sold at the price of $80 per ton in effect on August 31, 1950 the total sales would be $1,496,000. In producing this amount of strip and coil Newport would probably incur costs in the amount of $1,334,273, leaving a monthly profit of $161,727.

116. Up to August 31, 1950 $491,763 had been spent on the pipe mill.

117. Although it had been estimated that the pipe mill would earn between $100,000 and $150,000 per month when operating at a normal rate, there is no evidence as to when normal production might have been expected as of August 31, 1950.

118. Although there is evidence that Newport's steel facilities might be improved or its capacity expanded by changes in or additions to the facilities, any extra values which may attach to its capital stock because of these possibilities are so speculative in nature as to be beyond reasonable possibility of computation.

119. From September 15, 1947 to August 31, 1950 Newport paid no dividends on its stock.

120. The 398,927 shares of Newport stock sold to Wilport as of August 31, 1950, had a fair value as a control block of $20 per share. What value the block would have had if shorn of its appurtenant power to control distribution of the corporate product, the evidence does not show.

## IX

### Ratification

121. Under date of September 14, 1950, Newport sent a letter to its stockholders, signed by Frank S. Gibson, its president, to inform the stockholders of recent developments. This letter contained the following statements:

"On August 31, 1950, Wilport Company purchased approximately 400,000 shares of common stock of Newport Steel Corporation. Included among the shares purchased were shares owned or controlled by Mr. C. Russell Feldmann and members of his family. Wilport is a corporation owned by a diversified group of manufacturing companies, all of whom use steel in their own manufacturing operations, and all of whom have indicated their intention to remain or become customers of Newport Steel Corporation and to purchase steel from it at the same prices and on the same terms as other customers.

"At a meeting of the Board of Directors of the Company following such purchase, Mr. Feldmann and the other four directors resigned, and by Board action were replaced by Frank S. Gibson, Jr., William J. Mericka, Bernard A. Mitchell, Frank M. Cobourn and Glenn G. Paxton, who were suggested for the office by Wilport Company. The new Board elected Mr. Gibson Chairman of the Board and President, to succeed Mr. Feldmann; Mr. Mericka Vice President and Chairman of the Finance Committee; and Mr. Paxton Secretary of the Company."

122. This letter was not sent to Newport's stockholders of record as of January 19, 1951. There is no evidence that any of the stockholders of Newport as of January 19, 1951, with the exception of those in the Wilport group, had received or were aware of the letter of September 14, 1950.

123. Under date of January 19, 1951, Newport's management sent out to its stockholders a Proxy Statement which contained the following statements:

"On August 31, 1950, Wilport Company purchased 398,927 shares of the common stock of the corporation. At a meeting of the Board of Directors following such purchase, Frank L. Taylor, A. F. Lorenzen, Joseph V. McKee, Jr., Daniel Scheaffer and C. Russell Feldmann, all of whom were elected directors at the last annual meeting of the stockholders, resigned and were replaced in turn by successive resolutions of the Board, by Frank S. Gibson, Jr., Glenn G. Paxton, Frank M. Cobourn, William J. Mericka and Bernard A. Mitchell. At the meeting, the resignations of C. Russell Feldmann as President, William A. Alfs as Vice President and General Counsel, and H. E. Hamilton as Secretary, were also accepted. George H. Roderick was elected a director to fill the vacancy caused by the subsequent resignation of Glenn G. Paxton, on November 28, 1950. The principal officers of the corporation, who have been elected on or since August 31, 1950, are: Frank S. Gibson, Jr., Chairman of the Board of Directors and President; William J. Mericka, Vice President and Chairman of the Finance Committee; Bernard A. Mitchell, Vice President; Frank M. Cobourn, Secretary and General Counsel; and H. E. Hamilton, Treasurer and Assistant Secretary."

"Wilport Company is a corporation owned by a group of manufacturing companies, all of whom use steel in their own manufacturing operations. Beginning with small quantities in the month of October, 1950, and increasing to substantial tonnages in later months as Newport Steel Corporation was able to supply steel to the manufacturing companies who are stockholders of Wilport Company, sales of steel to such companies have been made. Such sales have been at the established mill prices of Newport Steel Corporation, and on its regular terms of payment."

The Proxy Statement disclosed that Gibson, Mitchell, Mericka and Cobourn were also officers or directors of Wilport.

124. Under the same date, January 19, 1950, Newport sent its 1950 Annual Report to its stockholders, which included the following statements:

"On August 31, 1950, Wilport company acquired approximately 400,000 shares of the Company's Common Stock. After the purchase the former directors of the Company resigned and were replaced by Frank S. Gibson, Jr., William J. Mericka, Bernard A. Mitchell, Frank M. Cobourn and Glenn G. Paxton. Glenn G. Paxton has since resigned as Director and Secretary, and was replaced by George H. Roderick as Director, and Frank M. Cobourn as Secretary."

"Suits by Stockholders:

"Several civil actions have been filed and are pending, which are derivative actions brought by stockholders on behalf of the Corporation. None of them seek recovery of money from the Corporation. Some of them seek to recover for the Corporation a part of the price realized by the former President and other stockholders from the sale of certain Common Stock of the Corporation."

125. At the annual meeting of Newport's shareholders, held on February 19, 1951, the following resolutions were adopted:

"*Resolved,* by the shareholders of Newport Steel Corporation, that the

action of the directors of this corporation in accepting the resignations of certain of the former officers and directors of this corporation and in electing their respective successors, as set forth in the minutes of the meeting of directors held on August 31, 1950, be, and the same hereby is, ratified, approved and confirmed."

"*Resolved,* by the shareholders of Newport Steel Corporation, that the action of the officers and directors in authorizing and approving the sale and delivery from time to time of steel produced by this corporation, at its then prevailing mill prices, to stockholders of Wilport Company, be, and the same hereby is ratified, approved and confirmed."

"*Resolved,* by the shareholders of Newport Steel Corporation, that all the acts of officers and directors of this corporation since the date of the last annual shareholders' meeting held March 27, 1950, be, and the same hereby are ratified, approved and confirmed."

126. At said annual meeting of Newport's shareholders held on February 19, 1951, the following shareholders were present:

| Name | Number of Shares Held |
|---|---|
| W. D. Jefferson, in person | 1,000 |
| Wilport Company, by Glenn G. Paxton, Bernard A. Mitchell and William J. Mericka, proxies | 398,927 |
| *Others,* by Frank S. Gibson, Jr., William J. Mericka and H. E. Hamilton, Proxy Committee | 464,692 |

making a total number of 864,619 shares present in person or by proxy out of 1,078,535 shares issued and outstanding and eligible to vote at the meeting. The said H. E. Hamilton was, on February 19, 1951, the treasurer and assistant secretary of Newport.

127. The proxies for the 464,692 shares represented by the "Proxy Committee" (composed of Gibson, Mericka and Hamilton) had been solicited by Newport's management by means of the proxy statement dated January 19, 1951, set forth in Finding 123 above.

128. Neither the letter of September 14, 1950 nor the proxy statement of January 19, 1951, nor the 1950 Annual Report contained any statement as to (a) the price paid by Wilport for the stock it acquired from the Feldmann group, or (b) the fact that the option agreement of August 24, 1950 had contained a promise by Feldmann to "deliver to you, at the time you exercise the option, the resignations of all the members of the Board of Directors of Newport Steel Corp." None of these documents contained any discussion of the possible impact of the stock sale and change of directors on Newport's possible future participation in "Feldmann Plan" activities.

129. Prior to the commencement in this Court of the action entitled "Arthur Kramer, et al., plaintiffs, vs. Newport Steel Corporation, et al., defendants" (Civ. No. 3270), which action was subsequently consolidated in the present action, plaintiffs Arthur Kramer, Isaac Wagner, A. Charles Lawrence, Inger Lawrence, James J. Lawrence, Muriel Lawrence, and Edith Lawrence duly demanded of the directors of Newport that they cause it to institute action on the grounds complained of herein, but the directors of Newport failed and refused to comply with this demand.

130. Demand by plaintiffs Jane Perlman, Emily Reumert and Harry Mernoff that the directors of Newport cause it to bring suit against the individual defendants on the grounds herein complained of, would have been futile because:

(a) At the commencement of this action by plaintiff Jane Perlman on October 2, 1950, the board of directors of Newport consisted of Frank S. Gibson, Jr., William J. Mericka, Bernard A. Mitchell, Frank M. Cobourn and Glenn G. Paxton. The board has since remained unchanged except that, on November 28, 1950, Glenn G. Paxton was replaced by George H. Roderick.

(b) All of said persons were and are directors of Wilport, except that Roderick became a director of Wilport on June 5, 1951. Gibson, Mitchell, Mericka and Roderick were and are officers of corporations which were and are stockholders of Wilport. Cobourn and Paxton were and are attorneys representing some of said corporations. Mericka and Cobourn conducted the negotiations with Feldmann which resulted in the sale by him of a block of common stock of Newport to Wilport.

(c) All of said directors of Newport participated in the transactions herein complained of and hence it could not reasonably be expected that they would institute and conduct this litigation.

(d) Defendant Newport was caused by said directors actively to oppose the prosecution of this action.

131. Demand by plaintiffs upon the stockholders of Newport to bring this suit would have been futile because:

(a) Under the laws of Indiana, Burns' Annotated Indiana Stats.1948, § 25–208, the directors and not the stockholders manage the affairs of Newport, including the bringing of action for it. The stockholders as a body cannot by resolution manage Newport or compel its management to bring suit.

(b) Compliance by Newport's management with a stockholders' resolution to bring this action would have left the conduct of the action in hostile hands and it could not have been properly prosecuted.

(c) Efforts to secure action by Newport's stockholders would require a proxy fight with Newport's management. The management controls approximately 37% of Newport's outstanding stock. The remaining stock of Newport is widely dispersed among several thousand shareholders whose identity changes from day to day. The management is in control of Newport's proxy machinery. An attempt by plaintiffs to displace Newport's management would have been unavailing.

## Conclusions of Law

1. The court has jurisdiction of the parties and of the subject-matter of the action.

2. The plaintiffs, as stockholders of Newport, have the right to maintain this action in the right and for the benefit of Newport.

3. The power of a control block of stock to control management and particularly the power of such a block to control the distribution of the corporate product, is not a corporate asset but rather an attribute inseparably attaching to the stock which, if it has any effect on value, is an inseparable factor entering into the value of the control block.

4. On the basis of the facts found, the defendant C. Russell Feldmann breached no fiduciary duties which as officer, director or stockholder he owed to Newport or to other stockholders, either (a) by selling a control block of Newport stock to Wilport or, simultaneously with the sale, (b) by cooperating with Wilport in bringing into office a new board of Newport directors nominated by Wilport and thereby accomplishing an immediate transfer of control to Wilport. Nor did the other defendants breach, or participate in the breach, of any fiduciary duties.

5. Even if Feldmann's conduct in cooperating to accomplish a transfer of control to Wilport immediately upon the sale constituted a breach of a fiduciary duty to Newport, no part of the moneys received by the defendants in connection with the sale constituted profits for which they were accountable to Newport.

6. Feldmann's conduct, if held to be a breach of fiduciary duty, was not ratified by Newport's stockholders.

7. The defendants are entitled to a dismissal of the action on its merits, with their costs.

## Opinion

This is a derivative action commenced by certain of the minority shareholders

of the Newport Steel Corporation, an Indiana corporation hereinafter referred to as "Newport" engaged in the production of steel. The principal point at issue, under the pleadings and arguments of the parties, is as to the right of the defendant C. Russell Feldmann (hereinafter called "Feldmann") and a group of friends and associates to retain the sum of $7,978,540 which was received in connection with the sale of 398,927 shares of Newport stock—311,000 of which were the property of companies controlled by Feldmann—to the Wilport Corporation on August 31, 1950, at $20 a share. At the time Feldmann had control of the largest block of Newport stock and was its chief executive officer and a director. The stock sold comprised 37% of the Newport stock outstanding and carried with it working control of Newport. The Wilport Corporation is a Delaware corporation formed by a group of end-users of steel for the express purpose of acquiring and holding a control block of Newport stock. Aside from Feldmann and Newport, the defendants in the action are all members of Feldmann's family who joined with him in putting together the block of stock which was sold to Wilport.

It is the plaintiffs' claim that the sale of stock, with an accompanying transfer of Newport's corporate offices to Wilport's nominees, constituted a breach of Feldmann's fiduciary duties to the corporation which resulted in "profits" to the defendants for which they are accountable to Newport. And to understand what the plaintiffs mean by "profits" in the context of this case one must have in mind that the challenged transaction occurred some time after our national entrance into the Korean enterprise as a result of which there was a "short" or "gray" market in steel. In that situation steel producers were in a position to exact for their product from hungry end-users of steel a price premium over and above prices fixed on the basis of mill costs. There was then no "black" market because at the time sales at a premium were not illegal. There was, however, a "gray" market in which sales were made at premiums. This market, out of patriotic considerations, reputable producers (and so far as the record shows Newport qualified for this classification) declined to enter: without legal compulsion they agreed to forego their advantage and to sell at not above posted prices which tied in with their respective mill costs. The plaintiffs say they have no criticism of Feldmann's management of Newport for its self-restraint in this respect. But they contend that, since Feldmann's sale of a control block was to a group of end-users of steel, who were thus enabled to divert Newport's production to themselves, at a price allegedly in excess of the value of the stock but for the effect of the gray market, this excess of value which was covered into the purchase price received by Feldmann (and his associates) was in effect a gray market premium and constituted a "profit" on a "corporate asset" wrongfully diverted from the corporation into Feldmann's individual pocket.

The defendants deny that there has been a breach of any duty owed to Newport. It is their position that the transaction in question was merely a sale of a block of stock with the rights and powers attaching thereto. They assert also that if any of Feldmann's acts as an officer or director are in issue, these acts were ratified by vote of the shareholders at Newport's annual meeting on February 19, 1951 and therefore cannot now be made the basis of an action by the corporation.

On analysis it will be seen that the basic question in the case is one of law. In the state of the steel market as it existed on August 31, 1950, was the admitted power inherent in a control block of corporate stock to control the distribution of Newport's product and to select those who may become its customers a corporate asset as the plaintiffs contend, or was it something properly pertaining to the ownership of a control block of stock the value of which was necessarily and properly reflected in the value of the stock as the defendants contend? I turn

directly to a discussion of this central issue.

When the distribution of a corporate stock is such that as a practical matter under the corporate charter and by-laws a given block—whether a majority block or one somewhat less—can control the election of the directors, the power is one that may be utilized to control the corporate management. This power of control, it should be remembered, springs from the electoral power of the stock. By the very nature of its origin, its only existence is as an adjunct of the stock: it is not the subject-matter of separate sale in any or all of its specific applications. It is obvious, I think, that some at least of the specific applications of the power have inherent value effective to enhance the value of a control block of the stock.

For instance, to the usual minority stockholder in a corporation the value of his stock necessarily depends on earnings which in turn depend on the abilities of its management. But one considering the purchase of a control block in a corporation may give less weight to past earnings since, if a change in management might be beneficial, the power to make such a change is in his hands. Thus, where the purchaser feels that the corporation's past record does not adequately reflect its realizable possibilities, he may well feel justified in paying more than the quoted market price for a control block of its stock, on the theory that the present price probably has been determined in large measure by the corporate earnings under the old management. Surely this power through stock control to improve the corporate performance may be a factor of value attaching to a control block of stock.

Turning to another specific application of the power of corporate control it is apparent that under normal conditions such power as management has to select customers for the corporate product is not generally a factor of substantial value. However, where—as here—because of imbalance between supply and demand the corporation cannot supply all who are eager to become customers, it is obvious, I think, that the power to control the selection of the customers is a factor adding materially to the value of the block of stock to which the power is appurtenant. It is another one of the incidents of the electoral power of stock which contributes value to the entire bundle of rights and powers which is wrapped in a control block of stock.

Where a stockholder has power through his control of management to control distribution of the corporate product, whether he exercises his power or leaves it in abeyance, or whether he transfers it with his stock to another, the corporate balance sheet is not thereby affected. To view the power in management, or in a stockholder through his control over management, to select the customers of the company as a corporate asset in itself, is to indulge in a confusion of thinking which would introduce unsettling confusion throughout the world of commerce. For the power to select customers if an asset is one having value only because it carries ability to command a premium price for the corporate product—a condition obtaining only in a seller's market when demand exceeds supply: in a buyers' market no such condition exists. What chaos would ensue if a corporate balance sheet to have precise definition required adjustment for every shift in the balance between supply and demand—and if, to determine the rights of a corporation vis-a-vis a particular stockholder, it were necessary to determine not only the balance between demand and supply for the corporate product but also whether the particular block of stock involved, considered for its relation to the current distribution of all the stock, carried practical control of the corporation!

The plaintiffs' repeatedly expressed assumption that in the situation here the power to control the corporate distribution was a *corporate asset* is scarcely consistent with their prayer that the defendants be required to pay over the consideration therefor not to the corporation for the benefit of all stockholders

but instead to stockholders exclusive of Wilport, the largest stockholder of all. Nor is such an assumption supported either by citation of authority or by reason. Even assuming that the price received by Feldmann reflected the value of the power to control distribution of the corporate product, it is fallacious to argue that the sale cloaked a gray market transaction whereby Feldmann, whose management led Newport to forego premium prices on its product which it might have obtained for the benefit of all stockholders, obtained individually the equivalent of a price premium in capitalized form for the benefit only of the minority stockholders who owned the control block. If members of the Wilport group in gray market transactions had merely bought steel from Newport at a premium they would have remained free from responsibility for producing steel and all the hazards which attend the steel industry. Instead, by a capital investment they made a long-range commitment to the production of steel and accepted the attendant vicissitudes. This feature of the transaction takes it outside the gray market. Their initial investment presumably contributed less to the restoration of balance between supply and demand than would have resulted from a commitment of capital to new production facilities. But there was nothing in the law or the business practice at the time which extended the prohibition against "gray market" premium purchases of the end-product to the purchase of production facilities. Indeed, restrictions on the sale of basic production facilities thereby freezing the committed capital, would obviously tend to obstruct the achievement of balance between supply and demand by discouraging investment in new sources of supply. But even if, contrary to my view, it was unethical under the circumstances for Feldmann to sell his stock and for Wilport to buy it, it does not follow that a corporate asset was involved.

█ I hold that the power to control the distribution of the product is not an asset of the corporation. The power, irrespective of its value in a particular case, is a direct attribute of management and an indirect attribute of a control block of stock. It thus may constitute an additional factor of value attaching to the control block, which enures to the benefit of its owner and may be realized by him on its sale. Levy v. American Beverage Corp., 265 App.Div. 208, 38 N.Y.S.2d 517, 526; Stanton v. Schenck, 140 Misc. 621, 251 N.Y.S. 221, 233; Mayflower Hotel Stock Protective Committee v. Mayflower Hotel Corp., 84 U.S.App.D. C. 275, 173 F.2d 416; Hauben v. Morris, 255 App.Div. 35, 5 N.Y.S.2d 721; affirmed 281 N.Y. 652, 22 N.E.2d 482; and Roby v. Dunnett, 10 Cir., 88 F.2d 68.

From this it follows that the price received is not invalidated as evidence of value merely because it reflects the value of the power to control distribution. And here there is no evidence of circumstances surrounding the sale, such as fraud, duress, mistake, etc., which if present would destroy or impair the probative effect of price received as evidence of value. That being so, the evidence of an actual price, determined by the process of arm's-length negotiations as to the value of a control block between informed parties—the principal seller having long been the active, responsible, executive of the business and the buyers being a group which had made a painstaking investigation of all phases of the business and had had the benefit of expert advice of its own choosing—is by far the most convincing evidence as to value in the record. Certainly its reliability far exceeds the opinion testimony of any of the experts, or price quotations for small lots. The defendants are thus entitled to a dismissal because a great preponderance of the evidence shows that each received no more than a pro rata share of the fair value of the block sold.

The simple holding just indicated is decisive of the case, as will be apparent when one examines its impact on every position taken by the plaintiffs. To that task I now turn.

The plaintiffs contend that Feldmann, both as the controlling stockholder and also as an executive officer and director of the corporation, violated some fiduciary duty and thereby either caused harm to the corporation, or regardless of harm to the corporation, secured a profit for himself and his co-defendants for which the defendants are accountable.

■ Consider first the plaintiffs' charge of breach of fiduciary duty by Feldmann, in view of his position as the dominant, controlling stockholder. If the power to control distribution of the corporate product were a corporate asset, to the extent that the sale price included the value of this power the defendant sold and received payment for a corporate asset. For minority stockholders thus to realize personally on a corporate asset would obviously constitute a breach of fiduciary duty. If, however, as I hold, the power in question is not a corporate asset, the transfer of the power could not constitute a conversion of corporate property and there was no breach of fiduciary duty which was based upon a claimed conversion.

■ But the plaintiffs contend that the sale was a breach of Feldmann's fiduciary duty because the resulting transfer of control was likely to injure the corporation as Feldmann should have known. For this contention, the facts of the case provide no basis. There was no evidence of intent or effort on the part of the old management or the new to jettison old and valued customers or to sell the corporate product to the members of the Wilport group *at a favored price less than the posted mill price*. Feldmann's testimony that end-users of steel, if stockholders with a voice in Newport's management, might be expected to constitute a source of strength, not harm, to Newport when the sellers' market should give way to a buyers' market, sounded highly plausible to me. However that may be, there is no direct evidence, nor do the facts leave room for fair inference, that Newport would be better off if it were to sell to X, Y or Z than to the members of the Wilport group or indeed that it had been harmed, or would be harmed, by the modified distribution of Newport output under the new management.

Nor did the evidence show that the defendants, in order to realize on the power to control distribution of output, injured the corporation by selling control to irresponsible persons lacking in manufacturing experience and business acumen who might have been expected to discharge or who, since the sale, have in fact discharged the managerial function with less than reasonable efficiency. Such evidence on the point as there is points in just the opposite direction. Whether the new management is as effective as the old, it is not necessary to decide: when a controlling stockholder wants to sell, nothing in the law requires him to defer action until he can find a purchaser of at least equal ability to assume the responsibilities of control.

Nor in my view did plaintiffs succeed in proving harm to Newport resulting from a failure of a merger with Follansbee on possible terms advantageous to Newport. Certainly the geographical separation between the Newport and Follansbee mills was a factor seriously unfavorable to a merger. Anyhow, there is nothing to show that Feldmann's sale prevented a merger: if, indeed, a merger were possible on favorable terms before August 31, 1950—a fact in my judgment not proved—so far as appears it was equally possible after that date.

Nor was the sale shown to have deprived Newport of any loss of opportunity to benefit from further applications of the so-called "Feldmann Plan". This was a financing technique, first developed by the defendant Feldmann, whereby end-users of steel furnished capital for new facilities taking as part consideration for their loans commitments upon the output of the new production facilities. The plan had been used several times to expand Newport's facilities in the past, on the whole with great success although at times successful results had been problematical due to the inherent

hazards of expansion in these uncertain times. However, there is no evidence here which proves that in 1950 financing under the Feldmann Plan was possible or, if so, that it would have been advisable for Newport to expand even with the aid of such financing. And here again it must not be forgotten that if in 1950 expansion was indeed desirable the use of the Feldmann Plan was as available to the new management as to the old. The Plan had been covered neither by copyright nor patent!

■ In this connection let me record my concurrence with plaintiffs' assertion that a corporate officer may be held accountable for wrongfully depriving his corporation of a business opportunity without proof that the opportunity, if availed of by the corporation, would have been successful. But before such a doctrine can come into play, there must at least be plain proof of the existence of an opportunity. Thus in the cases which the plaintiffs cite on this point there was evidence that the defendant had taken over a piece of property, as in Meinhard v. Salmon, 1928, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1; Irving Trust Co. v. Deutsch, 2 Cir., 1934, 73 F.2d 121, certiorari denied 294 U.S. 708, 55 S.Ct. 405, 79 L.Ed. 1243, and Pratt v. Shell Petroleum Corp., 10 Cir., 1938, 100 F.2d 833; or a business, as in Loft, Inc., v. Guth, 1938, 23 Del.Ch. 138, 2 A.2d 225; Durfee v. Durfee & Canning, Inc., 1948, 323 Mass. 187, 80 N.E.2d 522, which he should have offered to his cestui, the corporation. There is nothing in the evidence here to satisfy this basic requirement of the doctrine invoked.

But the plaintiffs go further and charge that Feldmann breached his fiduciary duties not merely by selling the stock but also by making wrongful use of his official corporate responsibilities without which, it is charged, a sale at a price as high as $20 would have been impossible. In this connection they point to the undisputed evidence that Feldmann contemporaneously with the sale called a meeting of the Newport directors at which by Feldmann's instigation all the old Newport directors successively resigned, the last so to resign being himself, and the vacancies thus created were successively filled with nominees of the Wilport group. The claim is that to facilitate a sale to his own personal advantage he misued his power as a dominant officer of the corporation; that for his personal gain he sold the Newport directorships and thereby, without the authority of a stockholders' meeting, accomplished an immediate transfer of the power to control the distribution of the corporate product. Defendants' counsel have argued that Feldmann's official cooperation in thus accomplishing a forthwith transfer of control was not a condition of the sale and that no part of the price paid was consideration for an agreement for the immediate transfer of control. This conflict as to the proper inference to be drawn I have resolved in favor of the plaintiffs (Finding 64) and have found that there was at least an informal agreement that the payment of the price should be accompanied with a forthwith transfer of control accomplished as above set forth.

■■ Even so, I cannot sustain the plaintiffs' contention that regardless of proof of harm done to the corporation Feldmann's conduct in thus cooperating to bring about a forthwith transfer of control constituted a breach of fiduciary duty. After all, Feldmann's act merely accelerated the transfer of control which the new owners of the control block would have accomplished at the next stockholders' meeting. So far as appears the procedure followed involved no direct violation of statute, or of the corporate charter or by-laws. It was in keeping with the policy of the law which deems that the choice of management for a corporation is best vested in stockholders who have the greatest interest at stake. In my opinion, it would be quixotic and unrealistic to brand as a breach of trust conduct which was free from fraud or overreaching and was neither intended nor effective to cause the slightest harm either to the corporation or other stockholders. Barnes v. Brown, 80

N.Y. 527; Levy v. American Beverage Corp., supra; Stanton v. Schenck, supra; Mayflower Hotel Stock Protective Committee v. Mayflower Hotel Corp., supra; Hauben v. Morris, supra; Oil Shares, Inc., v. Kahn, 3 Cir., 94 F.2d 751, reversed on other grounds, Oil Shares v. Commercial Trust Co., 304 U. S. 551, 58 S.Ct. 1059, 82 L.Ed. 1522.

Cases which plaintiffs cite to a contrary effect are to be distinguished. In Porter v. Healy, 244 Pa. 427, 91 A. 428, the defendant directors, who were majority stockholders, in order to obtain for their stock more than their *pro rata* share of a purchase price offered for the entire outstanding stock, made affirmative misrepresentations in a letter to other stockholders, and apparently diverted to themselves a part of the consideration which but for their fraud would have been available *pro rata* to all stockholders. As I analyze the opinion, it was because of this fraud that the cooperation of the defendants in bringing about a forthwith change in control by resigning and electing new directors nominated by the purchaser was held to be a sale of their official positions and hence a breach of trust. Here there is no evidence of fraud or indeed of any detriment to other stockholders. Rather the evidence shows only that Feldmann, as an incident to his sale of a control block, cooperated in accelerating the incidental shift of control, thus avoiding even a temporary situation in which those responsible for management should be without any substantial stock interest.

In Gerdes v. Reynolds, Sup., 28 N.Y.S. 2d 622, and Ballantine v. Ferretti, Sup., 28 N.Y.S.2d 668, the court found compelling reasons—all absent here—for an inference that the forthwith change in management was brought about not as a proper incident to a sale of a control block but rather as an overt act in a conspiracy to defraud other stockholders and permit the looting of the corporation.

Nor is Insuranshares Corp. v. Northern Fiscal Corp., D.C., 35 F.Supp. 22 apposite. There the defendant directors who sold their control block of stock to purchasers who sought and used the control thus gained to loot the corporation, were held liable because of negligence in failing to discover and prevent the contemplated fraud. Here there was no proof of such negligence on the part of Feldmann, no proof of intended fraud on the part of the purchasers, and no proof of looting or other harm to the corporation.

■ But even if Feldmann's conduct in this connection should be labelled as a breach of fiduciary duty, there is still absent an indispensible element in the plaintiffs' case. There is no evidence whatever that through the breach Feldmann or his associated defendants derived profits for which they are accountable to the corporation. In this connection it must be remembered that the plaintiffs frankly are not seeking the recovery of damages for harm done to the corporation by a breach of trust. Instead, plaintiffs rely upon the principle that "a fiduciary who has acquired a benefit by a breach of his duty as fiduciary is under a duty of restitution to the beneficiary," quoting from the Restatement, Restitution, Sec. 138(1). But this principle must be read in the context of the opening sentence of the introductory note to the Chapter (Chap. 7, page 522) from which the quotation was taken. Thus construed, it is clear that only one who has lost his property (or services) may have "restitution" of them. The same principle is recognized in the Restatement of Trusts, comment on Sec. 205(b), wherein it is stated that on a breach of trust "the trustee is chargeable with any profit made by him through the improper disposition or use *of trust property*" (emphasis supplied).

■ And so it is that the plaintiffs' claim of "profits" for which the defendants are accountable is valid in law only if the challenged transaction involved the transfer of a corporate asset. Thus, even if Feldmann, by cooperating in the immediate installation of the new board, committed a breach of trust, neither he

nor the other defendants are accountable for any part of the price received on the sale of their stock unless they had used part of the trust corpus, that is to say, some corporate asset, in the accomplishment of the transaction. This, under my controlling holding, stated above, was not done: the transfer of the stock with its inseparable power of control did not involve the transfer of any corporate asset. It follows that an essential element of the plaintiffs' case is completely absent. And this conclusion is required whether the transfer of control to the Wilport group be found to have caused the corporation some harm or whether, as I appraise the evidence, no harm resulted. For in neither case did the defendants receive any profits for which they were accountable. If harm resulted, at most the resulting damages were recoverable and damages have not been proved or even claimed.

Thus in the view which I take of the case there is no need whatever to follow through the laborious process advocated by the plaintiffs, viz., to find by evidence other than the actual sale price the fair value of the block of stock apart from its inherent power to control distribution of product and then by subtracting the value thus ascertained from the amount received by the defendants arrive at a remainder figure which would represent the value of the power to control the distribution of the product. However, to make my findings sufficiently complete for purposes of possible appeal I have included findings on the subject-matter of value which I now supplement by the following discussion.

On the issue of value the plaintiffs offered the testimony of an expert witness, and also placed in evidence both over-the-counter quotations for the stock during the period in question and the sales prices of small lots, all tending to prove that the value was under $20 a share. The defendants, on their part, also offered the testimony of an expert witness whose opinion was favorable to them, with some other supporting evidence. Although the defendants contend that market quotations are of no effect where the value of a control block is to be determined as is the case here, I hold that such quotations may at least constitute some evidence of value. Cf. Robertson v. Routzahn, 6 Cir., 1935, 75 F.2d 537. At a minimum, they serve as a check on a result arrived at by the use of some more complicated method of valuation. Bonbright: The Valuation of Property, pp. 244–9.

The plaintiffs' and the defendants' experts both testified to a valuation of the corporate stock by a method depending wholly or largely on a capitalization of what they considered to be the reasonably foreseeable earnings. As between the two "experts" I found the defendants' more worthy of credit. The plaintiffs' expert admittedly had never seen the corporate property and his information as to its facilities and business was clearly inadequate. His valuation method apparently gave little or no separate consideration to the corporation's properties other than its steel-producing facilities. Under the circumstances, I feel that his testimony, in so far as it consisted of an opinion as to the specific value of the stock, should be given no weight whatsoever.

The defendants' expert, on the other hand, exhibited a reasonably thorough knowledge of Newport's affairs. He had visited its steel-producing facilities and had been given free access to the corporate books. In his opinion, the stock sold to Wilport should be valued by first determining the value of Newport as an enterprise and then multiplying that figure by 37%—the per cent of the outstanding stock which the block sold to Wilport constituted. It was his position that because the block of stock was sufficiently large to give the holder control of the corporation, it should be valued as a proportionate part of the value of the whole business, and not on the basis of the value of the individual shares to a small investor. I agree.

Unit Values

In arriving at a value for Newport as an enterprise, defendants' expert first

valued each of its component elements and then added these separate valuations together to obtain a value for the whole. His unit valuations were as follows:

(1) The Detroit Realty. The witness stated that he had valued the property both on the basis of a capitalization of its expected earnings under a lease to the government, which gave a result of $1,657,500, and also by computing the net return to Newport if the government should exercise its option under the lease, which gave a value of $1,073,658. He took the lower figure as the value as of August 31, 1950.

(2) The Universal Cooler Division. This was valued at its book value as of August 31, 1950 or $2,718,051. The division was sold on October 31, 1950 for slightly more than its then book value and there had been no appreciable change in its situation during the intervening two months.

(3) The Caswell-Runyan Division. This was valued on the basis of a capitalization of its earnings. The witness annualized the division's average monthly earnings for the ten months preceding August 31, 1950, deducted income taxes at the rate of 42% and multiplied the result by five. This gave a value of $2,018,400.

(4) The Steel Facilities Other Than The Pipe Mill. The witness stated both a maximum and a minimum value for these facilities. In arriving at his minimum value he first estimated separately the expected earnings, before the deduction of taxes and general expenses, of the old steel facilities and the new. His estimate for the old facilities was based upon the actual performance of these facilities during June, 1950. In the case of the new facilities, which were not yet in full operation he determined the hypothetical profits for a "normal" month in the future by postulating a "normal" production for the facilities, multiplying that by the price per ton in effect in August, 1950 and subtracting therefrom expected "normal" monthly expenses, which he derived from esti-

mates made by Newport officials during the summer of 1950. The monthly gross profit, arrived at as above indicated, of the old facilities and the new were then combined and from this total he subtracted the general expenses actually incurred in operating these facilities during June, 1950 and also state and federal income taxes, computed at a combined rate of 43.68%. This computation showed a net profit at a monthly rate of $242,493 which was annualized (on an 11½ months' basis) and capitalized at a rate of 20%, thus indicating a minimum value for the facilities of $13,943,350.

The possible maximum value for the facilities, which was stated at $15,443,350, was computed by assuming that Newport might install an additional electric furnace whose production would be used in the strip mill, and then applying to the resulting increase in strip mill production the figures as to sales price and costs previously used.

(5) The Pipe Mill. The witness also stated minimum and maximum values for the pipe mill. His minimum suggested valuation was $491,763, an amount equal to that actually expended by Newport on the mill by August 31, 1951, at which time it was still under construction. His maximum valuation was $3,058,130, based on a capitalization of its expected profits.

Defendant's expert, having testified to the above "values" for the Newport's component units, then added these figures together and gave as his opinion that the corporation had a minimum value of $20,245,222 and a maximum value of $24,311,589. On the basis of these figures, he then stated as his opinion that the 37% control block sold to Wilport had a value of between $7,500,000 and $9,000,000, or in terms of individual shares between $18.80 and $22.55.

The plaintiffs attack this valuation claiming that the method used was unsound and in any event not properly applied to the facts of this case.

As to the method of valuation, it is generally agreed that the primary

determinant of the value of a going corporate business or of its outstanding stock should be the corporate earnings. Campbell v. American Fabrics Co., 2 Cir., 1948, 168 F.2d 959; Robertson v. Routzahn, supra. However, any estimate of the amount of the corporation's earnings and the relation between earnings and value necessarily is dependent on a number of factors determinable only by the exercise of judgment faculties. At least where the value of small lots is at issue, courts frequently equate value with quoted market price, providing the stock is actively traded. Groff v. Munford, 2 Cir., 1945, 150 F.2d 825. This is partly because it is recognized that so far as the small investor is concerned, the "value" of a stock may depend as much on the available quoted price on a stock exchange as on a value determined by a capitalization of earnings. And plaintiffs contend that this method should be used here.

This position, I rule, is not tenable in the setting of this case. Where the block of stock is sufficiently large so that it cannot readily be sold within a few days through the normal channels of an exchange, considerations other than the quoted market price must necessarily be considered. On the one hand, it may be apparent that the stock probably could not be sold at anything approaching the quoted market price on a forced liquidation. Groff v. Munford, supra. On the other hand, and especially where the block of stock is relatively large enough to carry working control, it may well have a value in excess of the quoted price for small lots. And so it is that in the situation here the value determined primarily from earnings is a more reliable basis of valuation than evidence of small-lot sales or quotations. This is especially so since, as the plaintiffs themselves assert, the corporation's future, as of August 31, 1950, appeared considerably brighter than its recent past. In particular the new steel facilities, which had been some two years in process of installation, were then just beginning to get into full production. The market situation for the steel facilities, in contrast to the previous year, was very good. Under the circumstances it seems to me inherently reasonable to believe that a valuation suitably reflecting the prospect of future earnings was more reliable than quoted market prices or, indeed, than actual prices for recent small-lot sales which necessarily fail to reflect future prospects dependent on factors not generally known to the market.

Nor can I sustain the plaintiffs' attack on the value which defendants' expert placed on the Detroit realty and the Universal Cooler Division. The valuation of these properties seems to me to be in all respects sound and to be based on the best available evidence. Manufacturers Paper Co. v. Commissioner, 2 Cir., 1937, 89 F.2d 684. Similarly, I think that a valuation of the pipe mill on the basis of its actual cost to Newport till August 31, 1950 is entirely reasonable,— if anything, on the conservative side. And the witness's method of estimating the profits for the new steel facilities by computing their probable normal monthly profits is essentially sound—as reliable as any method one could devise for that difficult problem.

However, I find insufficient basis in the record here to affirmatively establish his "maximum" values on the new steel facilities and the pipe mill.[1] I also find some plausibility in the plaintiffs' criti-

1. There is no evidence that an additional electric furnace could have been obtained by Newport as of August 31, 1950; no satisfactory evidence of what the cost would have been; no evidence that Newport had the money to buy one; no evidence either as to the amount of time that it would have taken to install such a facility; and not even any evidence that seri-

ous consideration was being given to its acquisition.

So far as the pipe mill is concerned, I find nothing in the record as to the cost of its completion. There is no evidence, either, as to when, as of August 31, 1950, the mill might first have been expected to reach the 4,000 tons per month production postulated by the witness: it went into

cism of the following factors in the valuation as made by defendants' expert: (a) the estimate of future normal earnings for Caswell-Runyan; (b) the esti- mate of future normal earnings for the old steel facilities; (c) the use of a 42% tax rate; and (d) the capitalization rate of 20%.[2]

actual production in April, 1951 but its maximum production per month through September 1951 was only 2,657.73 tons. The witness's conclusion as to the probable profits of the pipe mill were based entirely on the opinion of the witness Riefkin—and there is no evidence whatsoever as to the basis of Riefkin's opinion nor that Riefkin had had any prior experience with pipe mills. Under the circumstances, to the extent that the witness's opinion stemmed from his conclusions as to the probable future income of the pipe mill and an additional electric furnace, I find it to be without sufficient basis to be acceptable. Cf. Dairymen's Milk Co. of Pittsburgh v. McCormick Co., 3 Cir., 1940, 114 F.2d 736.

2. (a) In arriving at his opinion as to the value of the Caswell-Runyan Division, the witness first had to reach a conclusion as to the probable future annual earnings of the division before taxes. This he computed by annualizing the average monthly earnings, before taxes, of the division for the ten months preceding August 31, 1950. The total earnings for this ten-month period were $580,342.-88. The total annual earnings before taxes for the corporation's fiscal years 1949 and 1948 are also in evidence. They were, respectively, $124,421.09 and $195,-180.21. It was the witness's opinion that the probable future annual earnings would be $696,000 per year. If he had taken into account the actual earnings of 1949 and 1948, in addition to those for 1950, his estimate, on the same basis, would have been $318,000.

There is no evidence in the record that there were any appreciable changes of any sort in Caswell-Runyan's facilities or business, or in the industry in which it does business, at any time in the previous three years. It is engaged in the manufacture of cabinets for radio and television sets. On cross-examination the witness admitted that the radio and television business is highly volatile and I was not impressed by his attempts to explain his failure to give any weight whatsoever to the 1949 and 1948 earnings. He did not attempt to explain the basis for his opinion on redirect. The witness had not examined the Division's plant, and there is no evidence that he had given special consideration to the Division's competitive position.

It is true that the Division's actual earnings before taxes during the company's 1951 fiscal year were $694,100.04. Actual earnings may well constitute the best of all possible checks on an estimate of earnings. But I cannot admit that an estimate of value as of 1950 may properly reflect 1951 earnings which could not be reasonably foreseen in 1950.

(b) Old Steel Facilities Earnings. In arriving at his estimate of normal future earnings for the old steel facilities the witness annualized the actual earnings for June, 1950. He had available to him also the actual earnings for April, May and August, 1950, all of which were lower than June, but did not take these into account. There are no comparable figures available for the earlier months of 1950 or for 1949. However, it does appear that the steel division as a whole suffered losses during May-December, 1949 and February-March, 1950. During 1949 the operations of the new facilities never rose above a fairly low level and it is inherently reasonable to assume that the losses suffered by the division during that period were primarily due to the operations of the old facilities. Under the circumstances I feel that the witness's use of June, 1950 as the basis of his estimate for future earnings was over-optimistic. On cross-examination he could explain his choice of such a limited base only by reference to the general economic conditions of the time.

(c) Tax-Rate. In estimating Newport's future earnings, the witness applied a federal income tax rate of 42%. In actual fact, however, the corporation paid income taxes at a rate of approximately 67% during its 1951 fiscal year. (According to Defendants' Exhibit 54, the corporation paid taxes of approximately $4,120,000. on earnings of $6,161,643 during that period.) The Korean War started in June, 1950. In the light of experience during the previous war, I should think that as of August 31, 1950 corporate tax rates considerably higher than 42% might reasonably have been expected for the immediate future.

When questioned as to his use of a 42% tax rate, the witness stated that the possibility of future tax rises was immaterial, since if he had postulated a higher tax rate he would then have made a compensating adjustment in his rate of capitalization. Although he did not explain

The only other evidence which would tend to support a finding of a value for the block even as high as $18.80 per share is that given by the representatives of the Manufacturers Appraisal Co., who testified that in their opinion the "sound value" of the steel facilities was $39,983,262. Their study, however, was made primarily to determine the insurable value: it was based not at all on a consideration of earnings or earning capacity, and I think it clear, both on the basis of the witnesses' own testimony and also from a comparison of their estimates with other evidence concerning these facilities, that their conclusions are useful only as checks on the valuation made on other bases.

The plaintiffs' criticisms as listed above are all directed to judgment decisions made by the defendants' expert as of August, 1950. Considering the full impact of the facts disclosed in the record here upon the considered conclusions, as of that date, of a highly informed and experienced mind, although left without complete conviction that the witness is precisely right I cannot find him wrong—either as to the particulars which plaintiffs criticize or in his final valuation.

Although the testimony of the defendants' expert on value is thus seen not to be precisely definitive, it is by far the best informed and most convincing testimony on the subject in the record. It demonstrates convincingly that the stock sold was worth very much more than $4,000,000, contrary to plaintiffs' contention. It amply supports a finding that there was no such excess in the payments received by the defendants over the fair value of the stock which

---

the reasoning in back of this, I suppose that it may be based on a belief that a wartime rise in taxes would be likely to be accompanied by a general increase in prosperity so that the corporation's net income after taxes would remain unchanged. If that is his reasoning, however, it seems to me that it results in his counting the same factor twice, since his estimates of future income before taxes appear quite optimistic in and of themselves. If, on the other hand, it is the witness's belief that the value of a business is not responsive to a drop in its net income caused by a rise in income taxes, I find myself unable to follow him.

(d) The Capitalization Rate of 20%. In capitalizing the income of both Caswell-Runyan and the steel division the witness used a multiplier of five. I find no basis in the record for questioning his judgment in this as to Caswell-Runyan. The situation as to the steel division is somewhat different.

It seems possible, if not probable, that Newport may be hard put to make a profit from its old facilities in any sort of economic environment other than the boom conditions which have prevailed during much of the last ten years. The competitive position of the new facilities is a matter of greater uncertainty: it is unlikely that Newport will ever be able to produce at as low a cost as its principal competitors but this competitive disadvantage may perhaps be balanced out by freight advantages. At any rate, there is scant ground for inference of profits from the steel division under any conditions other than those of an outright boom. The defendants' witness was of the opinion that as of August 31, 1950 the then current boom conditions might reasonably have been expected to continue for at least two or three years. As to that, I agree. However, in my judgment estimates as to the further future savor of the speculative.

It was the witness's statement that he had checked his multiplier by comparing it to the ratio actually existing between the current earnings and quoted prices of other stated steel companies. I am not satisfied, however, that the companies selected were fairly comparable, nor does it appear to me that the comparison supports the witness's opinion.

Obviously the selection of a proper rate of capitalization requires an exercise of a broad judgment. In writing the foregoing I am acutely conscious of the fact that one having the qualifications of this witness, given the requisite objectivity, is better qualified than I to make the selection. But even though I recognize the limitations of my own faculties for passing judgment on such a point I cannot accept the conclusions of another which seem to me unsupported by adequate reasoning. I hold, therefore, that in the particulars above specified not that the conclusion is wrong but only that in its full sweep it is not fully proved by the testimony of this witness.

they sold as to put the defendants on notice of sinister intentions on the part of the purchasers. It furnishes support for my conviction, based also on other evidence, that Feldmann was sincere in his belief that the stock sold was actually worth what he received. Whether, standing alone, it proved that the stock sold had a fair value of at least $20, it is not necessary to decide. For as to that the burden was on the plaintiffs to prove a lesser value for the stock. Stanton v. Schenck, supra. That burden they have failed to sustain. Their failure on that score is ground for dismissal.

 The defendants' contention that the action should be dismissed for lack of a prior demand on the directors to bring suit, I overrule. Some of the plaintiffs here did make such demand and the directors did not accede thereto. Moreover, where an Indiana corporation is under the control of those whose acts are the subject of the contemplated suit, a prior demand on its directors is not necessary. Wayne Pike Co. v. Hammons, 129 Ind. 368, 27 N.E. 487. See also First Merchants National Bank & Trust Co. v. Murdock Realty Co., 1942, 111 Ind. App. 226, 39 N.E.2d 507. That was essentially the situation here.

The defendants take the position that in so far as Feldmann's acts as a director are here in issue, they were ratified at the annual meeting of stockholders held on February 19, 1951. At the meeting in question the shareholders there present, either in person or by proxy, voted unanimously both to ratify all acts of the officers and directors since the last annual meeting and also, more specifically, to ratify the action of the corporate directors in resigning and electing their successors on August 31, 1950. Of the 864,-619 shares present at the meeting 464,-692 shares, or considerably more than half, were represented by proxies solicited by the corporate management.

The defense of ratification cannot be sustained. Before a shareholder may be said to have ratified a director's acts he must have been apprised of all the material facts and their legal effect. Durfee v. Durfee & Canning, Inc., 1948, 323 Mass. 187, 80 N.E.2d 522, 531; Farwell v. Pyle-National Electric Headlight Co., 1919, 289 Ill. 157, 124 N.E. 449, 10 A.L.R. 363. That was not the case here. The defendants quote portions of a letter dated September 14, 1950, a proxy statement of January 19, 1951 and the 1950 annual report, which documents are claimed to have given the absent shareholders a full recital of all the facts material to the present causes of action. However, these documents made no mention of the price paid for the defendants' stock, of the understandings as to the installation of the new board immediately upon the consummation of the sale, or of the various facts on which the plaintiffs base their claim of probable injury to the corporation. Assuming for purposes of testing this defense that a right of recovery has been established, it seems hardly reasonable to hold it to be barred by the vote of the shareholders, a majority of whom are not proved to have had any knowledge of the particular facts on which that right is based. Cf. Schemmel v. Hill, supra, 169 N.E. 678 at 685.